## No. 10,229.

## Miss S. M. Lynch vs. T. J. Sellers & Co.

This case involves only questions of fact.

Where a party entered into a contract with the owners of the main building in the Exposition grounds to take down the trusses and spars at five dollars for each, and the owner, while the contractor was at work within the building, stripped it of sheathing, rafters, purlines and braces, so that the trusses and spars fell, some of which killed two of the contractor's employees and wounded another, held that he was justified in quitting the work and abandoning his contract, and that the owner of the building should pay him as damages the profits which he would have earned as though he had completed his contract.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor*, J.

*Harry H. Hall* for Plaintiff and Appellee.

*Rice & Armstrong* for Defendants and Appellants.

The opinion of the Court was delivered by

McENERY, J.   Plaintiff brought this suit to recover from defendants the sum of three thousand one hundred and ninty-five dollars and twenty cents, for services performed under and damages due her for violation of a contract entered into between them for taking down the main building, and for a contract to take down the government building in the Exposition grounds.   In relation to the government building it is alleged that there was a verbal contract made at the same time that the contract for the main building was executed, and that it was agreed between them that if the services about the main building were satisfactorily performed that the contract for taking down the government building would be awarded to plaintiff.

The written contract between the parties, in substance, is as follows :

The plaintiff was to receive five dollars for each truss or section, and each truss or section included the whole of the interior framework which was in position or place between two uprights or posts, and to include plates, braces, jack rafters, ridge pieces, purlines, double posts or uprights supporting plates on which spans of seventy-five feet spars and fifty feet spars rest, including also main uprights or posts.   False trusses and hip rafters were to be counted as trusses.   The whole was to be lowered and piled in their respective sizes, and scantlings, nails and spikes were to be knocked out.   All necessary and proper braces, struts, etc., were to be used by plaintiff for the safety of the various parts of the building.   All responsibility for injury to plaintiff's employees was assumed by her.   Work was to commence on June 14, 1886, and was to be completed by the 15th of July ensuing.   The passage ways were to be kept free from debris or lumber of any kind that might prove an obstacle to the work of plaintiff, she agreeing, however, to demand the services only of one person to clear away the lumber.   The whole work was to be done under the supervision of an architect, whose decision on all disputed points the plaintiff agreed to accept as final.

On the trial evidence was offered to prove that at the time of making the contract it was stipulated that the government building was to be awarded to the plaintiff, and that she took the contract for the main building with this understanding.   Objection was made to the introduction of this testimony.   The district judge overruled the objection and admitted it, to consider the question thereafter, whether or not there

was any contract relating to the government building which induced the plaintiff to accept the main building contract. Under this view of the question, the district judge did not err in admitting the evidence.

Plaintiff alleges and defendants deny any such contract. Brady, a witness, was present when the conversation occurred about the government building. He says Mr. Lynch wanted the contract for the government building. Mr. Sellers made the remark: "Do this first, and then we will talk about the government building afterwards. If you do this work satisfactorily then we will consider the government building." Banks says that Sellers told him that he had partly made an agreement with Lynch, and if he suited him he would give him both buildings. Reid says he was told by Sellers that he had let the main building to Lynch with the privilege of the government building. No contract is proved between the parties in relation to the government building. If any agreement was made it depended solely upon the will of defendants and was therefore a nullity.

There was but one contract which was reduced to writing, and referred only to the main building.

In the suit of Carey vs. Sellers & Co., who are the defendants in the instant case, T. G. Sellers, one of the defendants in that case on behalf of the defendants, swore that Lynch performed his work carefully, prudently and satisfactorily. They are now estopped from alleging violation of her contract. For the purposes of this case it is assumed that she performed all the obligations which her contract with the defendants imposed upon her. The contention is narrowed to the question whether or not T. J. Sellers & Co. so violated their contract with the plaintiff as to prevent her from carrying out her agreement with the defendants, in consequence of which she suffered damage and loss.

The contract stipulated that the building should be taken down under the supervision of an achitect. The selection of the architect was solely with the defendants, and they were responsible for his capacity and ability to perform the work.

No architect was appointed.

Cronan, who was not a practical or professional architect, was selected and appointed by the defendants to superintend the work of taking down the building. It does not appear that he performed any of the duties of an architect, or formulated any plans by which the building could be safely demolished and taken down. On one occasion, however, it seems, he notified T. J. Sellers of a dangerous line of trusses, but they were trusses which had been stripped by T. J. Sellers & Co. T. J. Sellers, one of the defendants, seems to have assumed the

duties of architect, and he gave general directions to the work going on.

In his testimony, he says, with an independent gang of laborers, while Lynch, agent of the plaintiff, was taking down trusses, he preceded him and stripped off the sheathing, purlines and rafters, and that Lynch took off no purlines, rafters or roof in advance of his work. He says, in section O, 24 spars weighing 9000 pounds each, and in section OP, 24 spars of same weight fell, and that in two other sections 27 spars fell, and that in all these sections in which spars fell they were stripped by his men, and that Lynch had not worked in any of these sections. All of these spars fell when no one was working there, and at different times. But he says they were blown down by a windstorm. He says, however, that they fell by reason of having been weakened by the taking out of purlines.

Lynch took out some sawbuck braces, but it does not appear that they weakened the building. The evidence is to the contrary. He took them out under protest, and under threat of being discharged if he did not do so.

On August 13, seven or eight spans fell, killing of two of Lynch's men and wounding another. Lynch narrowly escaped. His men were demoralized, refused to work in the building, and plaintiff abandoned her contract. Lynch remained in the building as long as it was prudent to do so, and only abandoned the work when he was painfully admonished that he could no longer remain in it with safety to himself and his laborers.

There can be no doubt but that the building was weakened by the manner in which it was stripped by the defendants.

Being aware of the dangerous condition of the building, Sellers & Co., on August 6, notified Lynch to properly brace the trusses in the seventy-five feet spans, on which he was about to commence work, and warned him of their intention to hold him responsible for any injury to materials, and "before starting work, these trusses must be braced in a secure manner, as will be designated by myself or the person authorized by me to act in the premises."

No plan of bracing was devised by Sellers & Co. The defendants offered in evidence Lynch's letter in reply, in which he promised to do what was necessary. It is presumed he did the necessary work to secure the braces. According to defendant's own statement he was not in default.

The evidence establishes the fact that the defendants, T. J. Sellers & Co., certainly violated their contract by improperly removing braces and purlines, and that plaintiff could not prudently continue to work in

said building; that the trusses fell from the taking away by them of the proper braces and supports. Before defendants could require plaintiff to enter said building and complete her contract it was their duty to make secure the remaining trusses. The plaintiff was not put in default. About one hundred of the trusses remaining were pulled down by Sellers & Co., because of their dangerous condition, and the balance were taken down after having been secured by another contractor.

The plaintiff is entitled to receive the profits which she would have earned if the contract had been completed, as it is defendant's fault that prevented her from completing the contract.

Lynch, the agent of plaintiff, and who did the work for her, says that the profit on each truss or span would have been $3 25. Defendants estimate the profit at $1 25, based upon a calculation from amounts paid for taking down the trusses that remained after Lynch quit the building. But the cost was greater, as the trusses had to be secured and it was made from a general average of amounts paid out.

We adopt plaintiff's calculation, as it is not directly contradicted.

There is considerable diversity of opinion among the witnesses as to the number of trusses taken down by the plaintiff, and the total number in the building.

We conclude that there were 618, and that the plaintiff took down 291, for which she was entitled to $1455. Of the remaining 327 trusses which were taken down, or fell down, she is entitled to a profit of $3 25 for each truss—amounting to $1062 75. She admits having received from the defendants $1532.

. The contract provided that she should take out the bolts, nails; take apart the trusses and pile and assort the lumber. A part of this she performed. No time was designated for the performance of this part of the contract, but it should be estimated in ascertaining the amount due her. We fix the amount for the trusses taken down by her, and which were not taken apart, bolts and nails not withdrawn, and lumber not piled and assorted, and the same work done by defendants on the trusses which fell and which were taken down by them, at $235. This calculation brings the amount due the plaintiff to within a fraction above the amount ascertained by the district judge.

We are of the opinion that the judgment appealed from did substantial justice between the parties, and it is therefore affirmed.

Poché, J., having not heard the argument in this case, takes no part.